## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 30 2018, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rebecca R. Vent
Howard County Public Defender's Office
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of C.M., A.M. and Z.M. (Minor Children), and

N.M. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

May 30, 2018

Court of Appeals Case No. 34A02-1711-JT-2578

Appeal from the Howard Circuit Court

The Honorable Lynn Murray, Judge

Trial Court Cause Nos. 34C01-1704-JT-139, -140, -141

**Crone, Judge.**

# Case Summary

N.M. ("Father") appeals the trial court's order involuntarily terminating his parental rights to his minor children C.M., A.M., and Z.M. (collectively "the Children"). We affirm.

# Facts and Procedural History

The Department of Child Services ("DCS") filed petitions to terminate Father's parental rights on April 6, 2017. Less than a week before the scheduled termination hearing, Father filed a motion to continue which was denied by the trial court. Evidentiary hearings were held on July 24, July 31, August 7, and August 14, 2017. Thereafter, the trial court found the following relevant facts:[1]

> 2. C.M. was born on November 14, 2002 and is currently 14 years old.
>
> 3. A.M. was born on June 8, 2009 and is currently 8 years old.
>
> 4. Z.M. was born on April 18, 2014 and is currently 3 years old.
>
> 5. M.M. [("Mother")[2]] is the biological mother of [the Children].
>
> 6. Father is the biological father of [the Children].
>
> 7. On July 8, 2015, DCS received a report that the condition of the home in which Mother and the Children were living was unsanitary and inappropriate, and Mother was using non-

---

[1] The trial court refers to the parties by their full names. We use "Father," "Mother," "DCS," and the minor children's initials where appropriate.

[2] Mother's parental rights were also terminated. However, she does not participate in this appeal.

prescribed medications and heroin while caring for the Children.

8. DCS investigated the family's home and confirmed that the conditions were unsanitary and inappropriate for the Children.

….

11. Due to Mother professing that she wanted to address her drug issues, a Safety plan was worked out temporarily removing the Children from the residence while Mother corrected the home conditions.

12. At the time that this investigation was commenced, Father was incarcerated at the Howard County Criminal Justice Center.

13. When interviewed by DCS, Father said that he started using illegal drugs when he was 7 years old and was currently addicted to heroin and prescription pain medications.

14. Because both parents expressed that they wanted to address their substance abuse issues, and the fact that the home conditions had improved, DCS and the parents entered into Informal Adjustment Agreements for each child that were approved by the Court on August 21, 2015.

15. The Informal Adjustment Programs required both parents to refrain from using any illegal substances or non-prescribed medications and for both parents to submit to random drug screens.

16. Despite DCS' involvement, both parents had multiple positive drug test results primarily for heroin.

17. After approximately one (1) month, both parents stopped participating and could not be located.

18. DCS subsequently located the parents at the Garden Inn

Hotel on October 26th, 2015, where they had been living with the children for several weeks.

19. Mother informed DCS that she and Father were no longer interested in participating in the Informal Adjustment Programs.

20. DCS received a subsequent report on November 2nd indicating that on October 30th the Kokomo Police Department had made contact with the parents at the Garden Inn Hotel and located two rocks of heroin inside a prescription bottle.

21. DCS investigated this new report and on November 4th proceeded to the parents' hotel room accompanied by law enforcement.

22. Located inside the hotel room were white residue, scales, razor blades, a straw, and frozen urine located inside the freezer.

….

25. Due to the parents' continued use of illegal and/or nonprescribed medications, all three children were removed from the parents' care.

26. C.M. and A.M. were placed with their maternal grandparents.

27. Due to the maternal grandparents' age and health, the youngest child Z.M. was placed in foster care.

28. Verified Petitions were filed on November 5, 2015 alleging that C.M., A.M., and Z.M. were children in need of services ["CHINS"].

29. A Fact Finding Hearing was held on December 21, 2015 and all three (3) children were found to be [CHINS].

30. A Dispositional Hearing was conducted on January 4, 2016.

31. Both parents were ordered to participate in services including substance abuse assessments and recommended treatment, random drug screens, mental health evaluations, parenting evaluations, parenting services, supervised visitation, maintain gainful employment, maintain appropriate housing for themselves and for the Children, refrain from any illegal activity that would jeopardize their ability to provide and care for their children, and to cooperate with DCS.

....

41. In November 2015, Father pled guilty to the offenses of possession of heroin, a level 6 felony, and possession of marijuana, a misdemeanor, pursuant to a plea agreement, which terms provided Father's sentence would be served on in-home detention and supervised probation.

42. Father was arrested on January 13, 2016 on an outstanding warrant for violation of the terms of his home detention; by his own testimony, Father admitted that he continued to use illegal substances resulting in the violation.

43. Father remained incarcerated and, [following a hearing,] he was ordered to participate in the Howard County Re-Entry Program in Howard Superior Court I.

44. On January 11, 2017, Howard Superior Court I entered an order finding Father violated the terms of his Re-Entry Program and had been taken into custody.

....

47. As a result of his termination from the Re-Entry Program, Father was ordered to serve the balance of his sentence in the Howard County Criminal Justice Center with a projected release

date of August 22, 2017.

....

50. Father has not had any positive drug screens since December of 2015; however, during this time, Father was either incarcerated or subject to conditions of probation and/or the Re-Entry Program.

51. As part of the Re-Entry Program, Father initially resided at the Kokomo Rescue Mission and subsequently moved to the CAM Family Shelter.

52. The CAM Family Shelter provides low cost housing that allows participants an opportunity to save up money to obtain independent housing for themselves and their family.

53. During the time Father resided at the Kokomo Rescue Mission and CAM Family Shelter, Father was employed earning up to $2,600 per month, and he had received a $5,000 tax refund.

54. Despite his earnings and the tax refund, and prior to his incarceration in January 2017, Father had not been able to save any funds towards establishing independent housing, instead using funds for his own living expenses, criminal fees and fines, obtaining a vehicle, and restoring his driver's license.

55. While in the Re-Entry Program, Father participated in services through the CHINS case including visitations with [the Children]; although from September 2016 through January 2017, he cancelled or missed approximately twelve (12) visits, a few visits missed due to work or illness, but others due to Father spending time with a girlfriend.

56. Since incarcerated in January 2017, Father had telephone contact with the Children for about a month until the

communications were stopped, as it was upsetting for the Children when Father blamed their Mother for their circumstances; Father sent no cards or letters to the Children in an effort to maintain contact with them.

....

58. The parents' oldest child C.M. ... recalls that throughout his life, his parents have regularly used drugs; in fact, Father admitted that for at least 11 or 14 years since C.M.'s birth, he used drugs.

59. While his parents were using drugs, C.M. regularly had to take responsibility for cleaning their home and caring for his younger sibling(s).

....

62. Based upon his past experience, C.M. does not believe his parents will stop using drugs or be able to provide [him] and his younger siblings with a stable appropriate home for any consistent period of time.

63. C.M. now feels safe and has a sense of stability living with his maternal grandparents, and is in favor of being adopted by them.

64. Despite expressing continuing love for both of his parents, C.M. feels strongly that he and his siblings need long lasting stability and permanency.

65. [Court Appointed Special Advocate ("CASA")] Lisa Wag[o]ner believes granting termination of Mother's and Father's parental rights would be in the best interest of the Children."

....

67. Despite Father not testing positive for illegal substances since December of 2015, Ms. [Wagoner] opined the unlikelihood Father would remain drug and crime free based on his long history of substance abuse and placing his own needs ahead of the Children's needs.

….

82. DCS' permanency plan for C.M. is adoption by his maternal grandparents and that the permanency plans for A.M. and Z.M. are adoption by the foster family with all Children continuing to maintain regular contact.

Appellant's App. Vol. 1 at 15-22.

[3] Based upon these findings of fact, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside the home will not be remedied by Father; (2) there is a reasonable probability that the continuation of the parent-child relationship between Father and the Children poses a threat to their well-being; (3) termination of the parent-child relationship between Father and the Children is in the Children's best interests; and (4) DCS has a satisfactory plan for the care and treatment of the Children, which is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petitions to terminate parental rights by clear and convincing evidence and therefore terminated Father's parental rights. This appeal ensued.

# Discussion and Decision

"The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id*. A petition for the involuntary termination of parental rights must allege in pertinent part:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove that termination is appropriate by a showing of clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144

(Ind. 2016). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[5] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

[6] In this appeal, Father contends that the trial court abused its discretion in denying his motion to continue the termination hearing. He also challenges the sufficiency of the evidence supporting the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside of his care will not be remedied, and that termination of his parental rights is in the Children's best interests.

## Section 1 – The trial court did not abuse its discretion in denying Father's motion to continue.

Father first contends that the trial court should have granted his motion to continue the termination hearing. The decision to grant or deny a motion to continue is within the sound discretion of the trial court, and we will reverse only for an abuse of discretion. *In re J.E.*, 45 N.E.3d 1243, 1246 (Ind. Ct. App. 2015), *trans. denied* (2016). An abuse of discretion occurs when the trial court's conclusion is clearly against the logic and effect of the facts and circumstances before the court or the reasonable and probable deductions to be drawn therefrom. *Id*. When a motion to continue has been denied, an abuse of discretion will be found if the moving party has demonstrated good cause for granting the motion, but we will reverse the trial court's decision only if the moving party can show that he was prejudiced by the denial. *Id*.

Father argues that his release from incarceration was scheduled for about a month from the first termination hearing date, and that the trial court had good cause to grant his motion to give him "the opportunity to be released from jail and re-engage in services." Appellant's Br. at 15. As stated above, we will reverse the trial court's decision only if Father can show he was prejudiced by the denial of his motion to continue. In an attempt to show that he was prejudiced, Father likens his situation to that of the incarcerated parents in *K.E. v. Indiana Department of Child Services*, 39 N.E.3d 641 (Ind. 2015), and *In re GY*, 904 N.E.2d 1257, 1266 (Ind. 2009). In both of those cases, our supreme court overturned the termination of an incarcerated parent's parental rights

concluding that, in light of each parent's imminent release from incarceration, it was in the children's best interests to give those parents additional time to participate in services. However, in each case, the primary condition for removal and continued placement outside the home was the parent's incarceration during the entire pendency of the CHINS case, and the parent whose rights were terminated never truly had an opportunity to participate in any services outside of incarceration. *See K.E.*, 39 N.E.3d at 644, 648-49; *GY*, 904 N.E.2d at 1263-64. Moreover, the parent in each of those cases participated in numerous programs while incarcerated to show a clear dedication to improving parenting skills and working toward reunification. *Id.*

[9] Unlike in those cases, the primary reason for the Children's removal and continued placement outside of Father's care was not his incarceration, but his drug addiction and inability to provide the Children with a stable home. Indeed, Father was not incarcerated for the entire pendency of the CHINS case. He was released on two occasions and was able to participate in reunification services outside of incarceration. While he did participate in some services, he continued to put his needs above those of the Children, choosing to squander money, skip visitation time, and ultimately revert back to criminal and other noncompliant behavior causing him to become reincarcerated. Moreover, while we commend Father for the programs he has completed during his most recent incarceration, this is not one of those extreme cases where there "was seemingly nothing else that [Father] could have been doing to demonstrate his dedication to obtaining reunification." *K.E.*, 39 N.E.3d at 649. Over the last

two years, Father's dedication to maintaining a parental relationship with the Children has been sporadic, to say the least. Under the circumstances, we cannot say that the trial court abused its discretion in denying the motion to continue. Moreover, Father has not shown that he was prejudiced by the trial court's denial. Therefore, we affirm that decision.

## Section 2 – Sufficient evidence supports the trial court's conclusion that there is a reasonable probability of unchanged conditions.

[10]     Father next asserts that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside of his care will not be remedied.[3] In determining whether there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id*. Second, "we 'determine whether there is a reasonable probability that those

---

[3] Father also argues that DCS failed to prove that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children. However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Accordingly, we will address the sufficiency of the evidence regarding only one of the three requirements. We do note, however, that our review of the record indicates that there is substantial evidence to support a conclusion that continuation of the parent-child relationship between Father and the Children poses a threat to their well-being.

conditions will not be remedied.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[11] Father argues that the Children were initially removed from his care due to his drug addiction, and he emphasizes that he has not tested positive for illegal substances since December of 2015. Thus, he asserts, there is insufficient evidence to show that there is a reasonable probability that his drug addiction will not be remedied. However, as specifically noted by the trial court, since his last positive drug screen, Father has consistently been incarcerated and/or involved with strict programs in the criminal justice system that would subject

him to sanctions if he tested positive. Indeed, while he may not have submitted a positive test, by Father's own admission, he continued to use illegal drugs while on home detention, which resulted in his 2016 arrest. The evidence further indicates that when Father was subsequently permitted to participate in the Howard County Re-Entry Program, he was terminated from that program for improper behavior, including concerns that he was purchasing drugs. Based upon ample evidence of "the nature and extent of [Father's] drug use, his history of prior relapses, and the fact that he continued to repeatedly use illegal substances despite DCS'[s] involvement and his involvement in the criminal system," the trial court was "unconvinced that Father will not return to his habitual behavior of using illegal substances." Appellant's App. Vol. 1 at 26. This was the trial court's prerogative, and we will not second-guess that determination. We conclude that clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability the conditions that led to the Children's removal and continued placement outside of Father's care will not be remedied.

## Section 3 – Sufficient evidence supports the trial court's conclusion that termination of Father's parental rights is in the Children's best interests.

Father also contends that the evidence does not support the trial court's conclusion that termination of his parental rights is in the Children's best interests. In considering whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors

identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id.* The trial court need not wait until the child is irreversibly harmed before terminating parental rights. *Id.* "The historic inability to provide adequate housing, stability, and supervision, coupled with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child's best interests." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The testimony of service providers may support a finding that termination is in the child's best interests. *McBride,* 798 N.E.2d at 203.

[13]     Here, DCS Family Case Manager Christina Knosp testified that throughout her involvement with the family, Father has been in and out of incarceration. She noted that during his periods of release, Father failed to comply with the terms of his home detention and further failed to successfully complete his re-entry program. She expressed significant concern regarding his habitual patterns of criminal behavior and his admitted long history of drug addiction, emphasizing that Father has only been able to remain clean when incarcerated or living "under a very strict program which required him not to use drugs." Tr. Vol. 2 at 35. Knosp stated that, despite ample opportunity, Father has never established a "track record" for staying drug free on his own. *Id.* at 36. Knosp testified that the Children had witnessed Father's multiple arrests, and that fourteen-year-old C.M. "has been forced to raise his younger siblings for years."

*Id*. at 35.  Acknowledging that Father was set to be released from incarceration in about a month, Knosp stated, "[W]e're back to square one at that point. [Father] has no job, he has, you know, no plans for working, for housing and all those things have to start over."  *Id*. at 36.  Knosp opined that termination of Father's parental rights is in the Children's best interests because, "[t]hese children deserve permanency.  This case has been open for over two years at this point."  *Id.*

[14]     Similarly, CASA Lisa Wagoner was unequivocal in her opinion that termination of Father's parental rights was in the Children's best interests.  She stated that she believes that Father's habitual patterns of conduct are most indicative of his future behavior and she does not believe that Father has put forth a good faith effort toward any sort of reunification.  She opined that the Children need stability and not to be let down again by Father as "has happened various times in their past."  *Id*. at 169. As noted above, the trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *See McBride,* 798 N.E.2d at 203. DCS presented sufficient evidence to support the trial court's conclusion that termination of Father's parental rights is in the Children's best interests.

[15]     In sum, we will reverse a termination of parental rights only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made. *C.A.*, 15 N.E.3d at 92-93.  Based on the record before us, we cannot say that the trial court's termination of Father's rights to the Children was clearly erroneous.  We therefore affirm the trial court's judgment.

Affirmed.

Bailey, J., and Brown, J., concur.